**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Kayode A. TESLIM,
Defendant–Appellant.**

No. 88–1283.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 3, 1988.

Decided Feb. 15, 1989.

---

Allan A. Ackerman, Chicago, Ill., for defendant-appellant.

Rick L. Jancha, Asst. U.S. Atty., James G. Richmond, U.S. Atty., South Bend, Ind., for plaintiff-appellee.

Before POSNER and RIPPLE,
Circuit Judges, and ESCHBACH,
Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

This is a direct criminal appeal from a jury conviction, pursuant to a four-count indictment. The defendant-appellant, Kayode Teslim, challenges his convictions on one count of conspiracy to possess with intent to distribute and to distribute cocaine in violation of 21 U.S.C. § 846 [1] and one count of possession with intent to distribute more than 500 grams of cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Teslim was sentenced to thirteen years in prison followed by a four-year term of supervised release, and ordered to pay a fine of $20,000 and a special assessment of $100 under 18 U.S.C. § 3013. Appellant now raises four grounds for reversal on appeal, including his assertion that his fourth amendment rights were violated when he was detained at an airport on mere pretext. He also contends that the trial court committed prejudicial error by allowing the prosecution to offer drug courier profile testimony to the jury. He further alleges that there is not sufficient evidence in the record to support his convictions. Finally, Teslim argues that the government's misconduct at trial deprived him of his right to a fair trial. We affirm the convictions.

I.

In September 1987 the Special Operations Section ("SOS") of the South Bend Police Department conducted a narcotics investigation. As a result of information gleaned from confidential informants and other participants, not named in this indictment, the defendant emerged as a suspected supplier, possessor, and co-conspirator in the trafficking of cocaine.

On September 25, 1987, at approximately 6:00 p.m., two SOS officers, Corporals Woltman and Miller, dressed in "plain clothes," were in the Michiana Regional Airport in South Bend, Indiana watching passengers deplane flights from "source" cities.[2] As part of an ongoing airport interdiction program, these officers were there to detect suspicious behavior of people exiting airplanes to determine whether these people might be possible drug couriers.[3]

---

**1.** The indictment charged a conspiracy to distribute more than 500 grams of cocaine. At the conclusion of the government's case-in-chief, the court found that the government had not proven that charge. The court submitted the case to the jury on the charge of conspiracy to possess with intent to distribute cocaine.

**2.** Chicago is considered a "source city" because many flights from the South and the West pass through there.

**3.** These officers received special training in profiling narcotics traffickers and in airport interdiction. Officer Miller attended a three-day program in which he received training in airport interdiction. Officer Woltman attended this same training program at O'Hare Airport and another two week course with the Drug Enforcement Agency. Tr. at 19, 53, 56, 243, 324.

At approximately 6:30 p.m., the officers observed the passengers exit United Express flight 2686 from Chicago and enter the terminal. While watching the passengers deplane, the officers' attention was drawn to a particular passenger, Kayode Teslim.[4] Both officers testified that they had not been instructed to look for Teslim, nor had they been given his description. Furthermore, they had not been briefed on a concurrent investigation that Darrell Gunn, an SOS lieutenant, was conducting. The police testified that the defendant attracted their attention because he appeared very nervous as he exited the plane and repeatedly looked over his shoulder.

In addition, Woltman recognized Teslim as someone he had seen before at local bars. When Woltman had previously seen Teslim, Teslim would leave with one person at a time for approximately five minutes and then return, sometimes four or five times a night with different people. Woltman told his partner, Corporal Miller, that he recognized Teslim and that he could be a possible drug trafficker. Woltman also told Miller that he had information from a confidential informant that the defendant was involved in drugs.

At the airport, Woltman and Miller observed the defendant deplane with two bags, a brown carry-on bag and a black satchel. They continued to follow the defendant as he proceeded through the airport. Teslim walked very quickly and continued to look over his shoulder. When he got through the tunnel of the airport, he went directly to a pay telephone and picked up the receiver as if to place a call. While he was at the telephone, Teslim continued to scan the airport in a manner consistent with an attempt to detect surveillance. Shortly thereafter, Teslim hung up the telephone and walked directly out of the terminal and into the parking lot without retrieving any luggage. The officers' training and experience had taught them that drug couriers frequently travel with only one or two pieces of carry-on luggage. As Teslim

was exiting the airport, he continued to look back over his shoulder.

As Teslim walked into the parking lot, he went directly east and surveilled the parking lot, then turned around, and walked directly west to a yellow 1979 Lincoln Continental. Teslim opened the car door, placed his luggage on the passenger's seat, and put the car in reverse when the police officers approached him. Teslim opened the car door and Woltman identified himself and his partner as police officers. Woltman asked Teslim whether he would be willing to talk with them and told him that he was under no obligation to do so. Teslim exited the vehicle and Woltman asked him for his driver's license. Woltman repeated to the defendant that he was under no obligation to talk to the police, but Teslim agreed and gave Woltman an identification card from Indiana. Woltman observed that the defendant had a difficult time retrieving the card from its case because his hands were shaking and his finger dexterity was poor. Woltman also asked him for his airplane ticket, but Teslim said he did not have it. Woltman observed that Teslim's voice was cracking as he talked to him. When Teslim was unable to produce a driver's license, Woltman asked him how he intended to drive the car without a valid driver's license, and Teslim responded by saying that someone was going to pick him up. The officers noticed that Teslim was very nervous, his voice changed, his hands were shaking, and he played with his keys as he spoke with them.

Woltman then handed the identification card to Miller, advised Teslim that they were conducting a narcotics investigation, and asked if he would consent to a search of his luggage. Woltman told the defendant that the search was voluntary and he could refuse. Teslim became very upset and said he was tired of this embarassment to him and his family. He refused to consent to the search of his luggage and told the police officers they would have to obtain a search warrant.

---

4. Teslim had flown from Miami to Chicago before taking flight 2686 to South Bend. The officers, however, did not become aware of this fact until after they had obtained the search warrant and searched the luggage.

At approximately 6:40 p.m., the police advised Teslim that they were going to contact Corporal Ron Gerkey, the head of a canine unit from the St. Joseph County Police Department, who would come to the scene with a police dog to conduct a "sniff test" of the vehicle for narcotics. The officers told Teslim that he could either stay with the luggage or they could give him a receipt for his luggage and that he was free to leave. Before leaving, the defendant placed a burgandy briefcase, that the police had not previously noticed, into the car. Corporal Miller then handed Teslim his identification card back, but the defendant gestured to the officer as if to indicate that he did not want it back and continued to walk into the airport. The defendant then entered the terminal and left the airport. The conversation between Teslim and the police officers took place in a public area and lasted approximately five to seven minutes. While Woltman went to call the canine unit, Miller remained with the car in the parking lot.

At approximately 7:05 p.m., Corporal Ron Gerkey of the St. Joseph County Police Department arrived with his dog, Bosco.[5] Bosco gave a positive, aggressive indication for the presence of narcotics at the passenger's side door of the yellow Lincoln.

Later that evening at approximately 10:00 p.m., Woltman obtained a search warrant from United States District Judge Robert L. Miller, Jr. authorizing a search of the automobile and its contents. During a search of the car, police officers found a package wrapped in brown plastic tape containing a white powdery substance and an airplane ticket in the name of Kayode Teslim in the right front pocket of the brown carry-on bag. The officers removed the package from the car and performed a field test on it. It tested positive for the presence of cocaine. The officers then sent the package to the DEA laboratory in Chicago, Illinois, where a chemist determined that the package contained 813 grams of 88%

pure cocaine. The estimated street value of this cocaine was approximately $300,000. The officers also found $6,000 cash in the burgandy briefcase. Defendant was arrested later that evening at his home in Elkhart, Indiana.

A grand jury, on October 15, 1987, returned a four-count indictment charging Kayode Teslim with one count of conspiracy to possess with intent to distribute and to distribute cocaine in violation of 21 U.S.C. § 846, two counts of possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and one count of possession with intent to distribute more than 500 grams of cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Prior to trial, Teslim moved to suppress the contents of the luggage seized from him at the Michiana Regional Airport parking lot, claiming that the police violated his fourth and fourteenth amendment rights by detaining him without reasonable, articulable suspicion. After a hearing, the district court denied Teslim's motion to suppress the cocaine finding that the officers had specific and articulable grounds to make a brief, investigatory stop of Teslim and that the detention of the vehicle and its contents was lawful and based on a reasonable suspicion that the luggage contained contraband. At trial, the jury found the defendant guilty of conspiracy and possession of more than 500 grams of cocaine, but acquitted him on the other two counts.

## II.

### A.

■ The appellant first argues that his fourth amendment rights were violated when the police used the drug courier profile as a pretext to detain him at the airport. The government contends that the encounter at the airport was purely consensual and that no seizure occurred.[6] In or-

---

5. Bosco received special training in narcotics detection, including heroin, cocaine, and marijuana. He also had experience in detecting cocaine in approximately 200 to 300 situations. 2 Tr. 150, 308.

6. The case law has developed three categories of police-citizen encounters. *United States v. Black*, 675 F.2d 129, 133 (7th Cir.1982), *cert. denied*, 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983). "The first, an arrest, is character-

der to determine whether the police violated a defendant's fourth amendment rights, the court must first determine whether the encounter was a "seizure" within the meaning of the fourth amendment. *See United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, *reh'g denied*, 448 U.S. 908, 100 S.Ct. 3051, 65 L.Ed.2d 1138 (1980). Although the fourth amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," U.S. Const. amend. IV, the Supreme Court has recognized that "not all personal intercourse between policemen and citizens involves 'seizures' of persons." *Terry v. Ohio*, 392 U.S. 1, 20 & n. 16, 88 S.Ct. 1868, 1879 & n. 16, 20 L.Ed.2d 889 (1968).

This circuit has adopted the Supreme Court's "reasonable person" test for determining whether a seizure has occurred in airport cases, such as the one before this court today. *United States v. Black*, 675 F.2d 129, 134 (7th Cir.1982), *cert. denied*, 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983). In *Mendenhall*, the Supreme Court concluded that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877.

The determination whether an encounter between a defendant and law enforcement officers rises to the level of a seizure under the "reasonable person" test is a highly factual one, dependent on the circumstances of the particular case. *Black*, 675 F.2d at 134. "Our standard of review is accordingly limited to inquiry into whether the decision of the district court is clearly erro-

neous, and requires that particular deference be given to the district judge who had the opportunity to observe the testimony and demeanor of [the witnesses]." *Id.*

In the instant case, the district court held that the defendant was seized for purposes of the fourth amendment when "the officers stopped the vehicle he was driving." District Court's Memorandum and Order at 7. While we might have characterized the moment of seizure differently, that alone is no reason to upset a finding that was not clearly erroneous. In determining that a seizure occurred when the officers stopped the defendant's car, the trial judge stated that this detention "differed from the routine airport interdiction...." *Id.* at 7–8. Rather than stop the defendant as he walked down the concourse, the officers stopped the automobile in which Teslim intended to leave the airport. Since the district court's finding of fact that a seizure occurred is not clearly erroneous, we are bound to accept it.

### B.

Once we have determined that a seizure has occurred for purposes of the fourth amendment, we must then analyze whether there was sufficient justification to arouse a reasonable suspicion that the defendant was engaging in criminal behavior. As previously stated, the fourth amendment requires that investigative detentions be supported by reasonable suspicion. *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880. An officer's subjective "good faith" or "inarticulate hunches" are insufficient to justify detaining a suspect. *Id.* at 22, 88 S.Ct. at 1880. Instead, a "police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reason-

---

ized by highly intrusive or lengthy search or detention...." *Id.* An arrest, which is considered a seizure, must be based on probable cause to believe that a person is committing or is about to commit a crime. *See id.* The second, an investigatory stop, is "limited to brief, non-intrusive detention during a frisk for weapons or preliminary questioning...." *Id.* This second type of encounter is also considered a seizure, but since it is less intrusive than an arrest, it requires only that an officer have rea-

sonable, articulable suspicion to believe that a person is committing or is about to commit a crime. *Id.* The third, a consensual encounter, "is that in which no restraint of the liberty of the citizen is implicated, but the voluntary cooperation of the citizen is elicited through non-coercive questioning...." *Id.* This encounter is not considered a seizure and does not require either probable cause or reasonable suspicion to justify it. *See id.*

ably warrant that intrusion." *Id.* at 21, 88 S.Ct. at 1880.

Since an investigative stop is permitted on less than probable cause, its scope must also be properly limited. "An investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983). The investigative methods that the police use must also be "the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id.* at 500, 103 S.Ct. at 1325–26. The government has the burden of proving that the stop was based on reasonable, articulable suspicion and that it was properly limited in scope and duration. *Id.*

The district court, in this case, concluded that there was no violation of the fourth amendment because the police had specific and articulable grounds to detain Teslim at the airport. The court also ruled that the detention was properly limited in scope. We agree with that determination.

In analyzing whether a reasonable suspicion of criminal activity exists, a court must consider the totality of the circumstances. *United States v. $73,277, United States Currency,* 710 F.2d 283, 290 (7th Cir.1983) (citing *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)). Officers Woltman and Miller were entitled to assess Teslim's behavior in light of their own extensive experiences as police officers. *Id.* Among the circumstances that can give rise to reasonable suspicion are: the officers' knowledge and experience of the methods used in drug courier activity, characteristics of persons engaged in such practices, and the behavior of a suspect who appears to be evading police contact. *Id.*

When Officers Woltman and Miller observed Teslim at the airport, they realized that he fit some of the characteristics of the drug courier profile. The "drug courier profile" is a compilation of characteristics commonly associated with persons transporting illegal drugs. *Royer,* 460 U.S. at 493 n. 2, 103 S.Ct. at 1322 n. 2. For

example, the officers noticed that Teslim appeared nervous and repeatedly looked over his shoulder as he exited the airplane. Teslim also walked through the airport quickly and took a roundabout route to reach his car in the parking lot. Nevertheless, the Supreme Court has ruled that the drug courier profile, by itself, can never constitute enough justification to detain a suspect for a *Terry* stop. *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam).

In this case, however, the officers had additional facts to rely on when they stopped Teslim in the airport parking lot. Officer Woltman recognized Teslim, as someone he had seen engaging in suspicious behavior at local bars. Woltman also had information from a confidential informant that the defendant was involved in drugs. *See Adams v. Williams,* 407 U.S. 143, 148, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1972) (information from a reliable informant can justify an officer's stop of a suspect). While some of these actions are also consistent with innocent behavior, we agree with the Second Circuit that "[i]t must be rare indeed that an officer observes behavior consistent *only* with guilt and incapable of innocent interpretation." *United States v. Price,* 599 F.2d 494, 502 (2d Cir.1979). When these facts are considered in the aggregate, we believe that the district court was correct in ruling that there was adequate suspicion to justify the officers' brief detention of Teslim in the airport parking lot.

■ We also agree with the district court that the detention of the defendant was properly limited in scope and duration. The officers stopped Teslim because they suspected him of being involved in the trafficking of illegal drugs, a legitimate and substantial government interest. *United States v. Place,* 462 U.S. 696, 704, 103 S.Ct. 2637, 2643, 77 L.Ed.2d 110 (1983); *Royer,* 460 U.S. at 498–99, 103 S.Ct. at 1324–25. The officers' detention of the defendant lasted only a very brief time, from five to seven minutes. *See United States v. Borys,* 766 F.2d 304, 312 (7th Cir.1985), *cert. denied,* 474 U.S. 1082, 106 S.Ct. 852, 88

L.Ed.2d 893 (1986). Teslim exercised his right to refuse consent to a search of his luggage and left the airport shortly thereafter. The investigative stop never ripened into an arrest, and there was no violation of the fourth amendment.

### C.

■ The facts, that created the reasonable suspicion to justify the investigative stop of Teslim, also supported the decision to briefly detain his luggage for exposure to a trained narcotics detection dog. In addition to the grounds already discussed, by the time that the officers informed Teslim that they were conducting a narcotics investigation and wanted to detain his luggage for a sniff test, the officers had even more facts to rely on. Although Teslim was seated in the driver's seat of the automobile and had his luggage in the passenger's seat, he did not have a driver's license. Teslim was also unable to produce an airplane ticket from the flight he had just exited. Finally, the officers noticed that Teslim became even more nervous as he spoke to them; his voice changed and his hands shook.

We agree with the district court that the police had adequate justification to briefly detain Teslim's luggage for exposure to a sniff test and that this detention did not exceed the bounds of the fourth amendment. In *Place*, the Supreme Court held:

> when an officer's observations lead him reasonably to believe that a traveler is carrying luggage that contains narcotics, the principles of *Terry* and its progeny would permit the officer to detain the luggage briefly to investigate the circumstances that aroused his suspicion, provided that the investigative detention is properly limited in scope.

462 U.S. at 706, 103 S.Ct. at 2644. A sniff test, by a well-trained narcotics detection dog, involves only minimal intrusion into a person's privacy. *See id.* at 707, 103 S.Ct. at 2644. It does not require opening the luggage, nor does it expose noncontraband items that would otherwise remain hidden from public view. *Id.*

In the instant case, the sniff test of Teslim's luggage did not violate the dictates of the fourth amendment because it subjected him only to a minimal intrusion of his privacy. Rather than open the defendant's luggage, the police exposed it to the sniff test when it was locked in the car. Only after the dog reacted positively to the presence of narcotics in the luggage, did the police then obtain a warrant to conduct a search of it.

■ Furthermore, the investigative detention of Teslim's luggage was properly limited in scope. In *Place*, the Court ruled that a ninety-minute detention of the defendant's luggage for exposure to a sniff test was unreasonable. *Id.*, 462 U.S. at 710, 103 S.Ct. at 2646. The length of the detention alone was enough to violate the fourth amendment, but this violation was further exacerbated by the government's failure to inform the defendant of what arrangements could be made for the return of his belongings. *Id.* In contrast, in *Borys*, 766 F.2d at 313, this court held that a "seventy-five-minute detention lies within the outer bounds of the Fourth Amendment."

The instant case, however, does not even present a close case on whether the police's seizure of Teslim's luggage at the airport violated the scope of the fourth amendment. Here, the police detained the luggage for only twenty-five minutes while they waited for the canine unit to arrive. This is clearly within the limits set out by the Supreme Court in *Place*. After the officers detained the defendant's belongings, he left the airport and the officers gave him a receipt to reclaim his possessions at a later time.

We believe the district court was correct in ruling that the police had reasonable, articulable suspicion to detain Teslim for a brief, investigatory stop at the airport. These grounds, coupled with other facts observed during the stop, led the police to reasonably believe that contraband would be found in the defendant's luggage. The detention of defendant's luggage was brief and conformed to the requirements of the fourth amendment.

### III.

■ Appellant next argues that the trial court committed prejudicial error by allowing the prosecution to offer drug courier profile testimony to the jury because it was irrelevant to the jury phase of the trial. Specifically, he argues that the government was trying to relitigate the suppression question in front of the jury. Appellant further contends that if this court agrees with his claim that he was stopped on mere pretext at the airport, then his due process rights were violated because a false impression was presented to the jury. Since we believe that the police relied on reasonable and articulable grounds in detaining Teslim, it is not necessary for us to reach the second part of his argument.

It is well established that a trial court has broad discretion to determine the relevancy of evidence. *United States v. Lampson*, 627 F.2d 62, 66 (7th Cir.1980) (citing *United States v. Micklus*, 581 F.2d 612, 617 (7th Cir.1978); *United States v. Bolin*, 514 F.2d 554, 558–59 (7th Cir.1975)). As an appellate court, we can reverse that ruling only on a showing of abuse of discretion. *Id.*

In this case, the drug courier profile testimony was relevant to the issue of proving the defendant's guilt or innocence. Possession of cocaine with intent to distribute under 21 U.S.C. § 841 includes the element of possession. The officers' testimony that they observed the defendant deplane carrying a garment bag, that was later found to contain approximately 800 grams of cocaine, is relevant to proving this element of the offense.

The officers' observations were also relevant to establishing the chain of custody of the garment bag containing the cocaine. A court is required to exercise greater care about the very identity of evidence than about possible changes in its condition. *Id.* at 65. As we stated in *Lampson*, "[t]he Government's burden of proving each and every element of the crime cannot be diluted by unwarranted presumptions about the evidence it seeks to introduce." *Id.* In order to prove Teslim's guilt of the crimes charged, it was necessary for the officers

to testify that they saw him walk off the airplane with the garment bag and put it into the car. If the government had merely presented a package of cocaine to the jury without this testimony, then the jury would have been unable to connect the cocaine to the defendant. Exclusion of testimony about the officers' observations at the airport would have hindered the government in proving its case.

The appellant also claims that the government was attempting to relitigate the suppression question in front of the jury. However, the cases he relies on are totally inapposite and do not support his contention. The cited cases are instances in which defendants wanted to relitigate the probable cause issue before the jury. The courts, in those cases, properly ruled that it is up to the judge, not the jury, to determine whether there is adequate probable cause to justify issuing a search warrant. *See Steele v. United States*, 267 U.S. 505, 511, 45 S.Ct. 417, 419, 69 L.Ed. 761 (1925); *Burris v. United States*, 192 F.2d 253, 255 (5th Cir.1951).

In the instant case, however, the government did not present the drug courier evidence to the jury to allow them to assess whether adequate probable cause for the search existed. Instead, the government presented this evidence to the jury solely because it was relevant to the issues of the defendant's guilt or innocence and the chain of custody of the cocaine, issues which were properly before them. For all of the foregoing reasons, we find no reversible error in the admission of the drug courier profile testimony to the jury.

### IV.

Appellant's third contention is that the evidence presented against him at trial was insufficient to establish his guilt beyond a reasonable doubt. He argues that the evidence was insufficient on the cocaine possession count because the police did not see him carry the briefcase or a clutch bag off the airplane and because the police did not compare the fingerprints on the drug package with those of an informant, Robert Solliday. At the end of their case, defense

counsel also moved for a judgment of acquittal on the conspiracy count. The district court denied the motion, but deleted the words "in excess of 500 grams" from the jury instructions on the conspiracy charge. Appellant now contends that conspiracy to possess with intent to distribute and to distribute cocaine is not a lesser included offense of conspiracy to possess with intent to distribute more than 500 grams of cocaine. We disagree with both contentions.

When reviewing a claim that the evidence at trial was insufficient to establish guilt beyond a reasonable doubt, we must determine whether, "viewing the evidence and all reasonable inferences in the light most favorable to the government, 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Goudy,* 792 F.2d 664, 674 (7th Cir.1986) (quoting *United States v. Herrera,* 757 F.2d 144, 149 (7th Cir.1985)). In evaluating a sufficiency of the evidence claim, we are not supposed "to weigh the evidence or to determine the credibility of witnesses. The verdict of the jury must be sustained if there is substantial evidence, taking the view that is most favorable to the government, to support it." *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), *quoted in United States v. Kord,* 836 F.2d 368, 371 (7th Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 72, 102 L.Ed.2d 49 (1988). In considering a claim of insufficient evidence, an appellate court can reverse a jury's verdict of conviction only if the defendant can establish that "the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *Goudy,* 792 F.2d at 674. Applying this standard to the instant facts, we conclude that there was sufficient evidence to support the jury's verdict on both counts.

■ Teslim argues that there was insufficient evidence to support his conviction of possession with intent to distribute cocaine because the officers did not see him deplane with the briefcase and small satchel.

However, the officers did observe Teslim deplane with the brown garment bag, in which the cocaine was later found. In fact, they testified that they saw him carry this bag through the airport concourse and put it into a car in the parking lot. The fact that the officers did not see Teslim deplane with the other two bags is not material to his guilt for possession of the cocaine. The police found the cocaine in a pocket of the garment bag, not in either of the other two bags.

Likewise, the failure of the officers to compare Solliday's fingerprints with those on the drug package has no bearing on Teslim's guilt for the crime charged. After obtaining a search warrant for the automobile, the police conducted a search and found over 800 grams of cocaine in the pocket of the suit bag Teslim carried off the plane. Teslim did not offer any evidence to rebut the officers' testimony. The jury was entitled to believe the police officers' testimony on these issues. We therefore find that the evidence was sufficient to support the jury's verdict that Teslim was guilty of possession with intent to distribute cocaine.

■ Teslim also contends that conspiracy to possess with intent to distribute cocaine is not a lesser included offense of conspiracy to possess with intent to distribute in excess of 500 grams of cocaine. Federal Rule of Criminal Procedure 31(c) provides that "[t]he defendant may be found guilty of an offense necessarily included in the offense charged or of an attempt to commit either the offense charged or an offense necessarily included therein if the attempt is an offense."

■ This court, sitting en banc, recently held that "an offense is necessarily included within another for the purpose of Rule 31(c) only when the elements of the lesser offense form a subset of the elements of the charged offense." *United States v. Schmuck,* 840 F.2d 384, 387 (7th Cir.) (en banc), *cert. granted,* — U.S. —, 108 S.Ct. 1727, 100 L.Ed.2d 192 (1988). In that case, we adopted the "elements test" and rejected the "inherent relationship

test." [7] Under either test, however, the offense of conspiracy to possess with intent to distribute and to distribute cocaine under 21 U.S.C. § 846 is clearly a lesser included offense of conspiracy to possess with intent to distribute and to distribute in excess of 500 grams of cocaine. *Cf. United States v. Rein*, 848 F.2d 777, 783–84 (7th Cir.1988) (holding that under either the "elements test" or the "inherent relationship test," attempting to possess marijuana is a lesser included offense of attempting to possess marijuana with intent to distribute). The two crimes are exactly identical except for the amount requirement. The elements of the lesser offense are a word-for-word subset of the greater offense and there is an inherent relationship between the two offenses. It was not irrational for the jury to have found the defendant guilty of conspiracy to possess with intent to distribute cocaine. Thus, we hold that the lesser offense was necessarily included in the greater offense for purposes of Rule 31(c) and there was sufficient evidence in the record to sustain the conviction on this ground.

### V.

Finally, we must address appellant's contention that the government's misconduct at trial deprived him of his right to a fair trial. While Teslim claims that a number of errors occurred at trial, he concedes that no single one constitutes reversible error. After reviewing the trial record, we are convinced that these alleged errors, neither alone nor in combination, are sufficient to warrant reversal of defendant's conviction.

 Teslim first asserts that the government impermissibly injected the aura of organized crime into the trial. During redirect examination of DEA Agent Purvis, the following conversation ensued:

Q. [By government counsel] Special Agent Purvis, Mr. Levine asked you if you were aware of the stop of Mr. Steinkraus and you indicated that you were; is that right?

A. [By witness Purvis] Yes.

Q. I believe he asked you if you were aware of the stop of Mr. Thomas and you indicated that you were?

A. Yes.

Q. You were being kept advised as to the nature of that investigation?

A. Yes, I was.

Q. And in fact on September 25th, 1987, were you in this area?

A. Yes, I was.

Q. And were you working another narcotics investigation?

A. Yes.

Q. And that was with your assignments to the Organized Crime Drug Task Force?

A. Yes.

4 Tr. 582–83. We believe that the reference to the Organized Crime Drug Task Force was ambiguous. There is no reason to believe that jury knowledge that Purvis worked for the Organized Crime Drug Task Force poisoned Teslim's trial. Nor was any suggestion made at trial that Teslim was involved in or had any connections to organized crime. There is also no other, independent evidence that the government was deliberately trying to inject the issue of organized crime into this case. *See United States v. Swiatek*, 819 F.2d 721, 730 (7th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 245, 98 L.Ed.2d 203 (1987). Thus, one solitary reference to a task force investigation did not prejudice the defendant's right to a fair trial.

Appellant next contends that two of the prosecution's comments during closing argument contributed to deny him his right to a fair trial. While we agree with Teslim

---

**7.** The "elements test" requires identity of the elements of the two offenses. In order for a lesser offense to be necessarily included within a greater offense, the elements of the lesser crime must form a subset of those of the charged offense. *Schmuck*, 840 F.2d at 385 (citations omitted). Under the "inherent relationship" test, a court must inquire into whether

there is an "inherent relationship" between the greater offense and the lesser one. Both offenses must relate to protection of the same interests and must be interrelated so that proof of the lesser offense is usually included within proof of the greater one. *United States v. Whitaker*, 447 F.2d 314, 319 (D.C.Cir.1971).

that the prosecutor's rebuttal comments were improper and constituted error, we further find that the errors were harmless beyond a reasonable doubt.

During the government's rebuttal argument, the prosecutor told the jury that "[i]f you are going to acquit Kayode Teslim in this case then your decision must be that the *Special Operations Section of the South Bend Police Department lied* about what happened with Jerry Steinkraus, what Mr. Steinkraus told them, that they *lied about with [sic] what happened to Mr. Thomas.*" 4 Tr. 708 (emphasis added). Defense counsel objected to this remark. The judge ruled that the argument was permissible, but sustained the objection because the argument was phrased improperly. *Id.* After the court sustained the objection, the prosecutor made the following remedial statement to the jury:

> [The following conversation ensued at sidebar]
>
> The Court: I think the government's argument with respect to the defendant's argument is permissible in light of the police officers having testified to having seen Mr. Teslim carrying the bag, that the defense theory [sic] it was already in the car. I'm concerned with the phrasing that in order to acquit the defendant you must find that the police officers lied.
>
> Mr. Jancha [prosecutor]: I will clear that up if you want me to, Judge.
>
> Mr. Levine [defense counsel]: I believe that would be acceptable. Thank you.
>
> [The following proceedings were had in open court]:
>
> Mr. Jancha: Ladies and gentlemen, as I was stating, the defense theory of this case is that everyone is lying about what happened. Now, you can find reasonable doubt based on many factors. You don't have to find the police officers lied to find reasonable doubt. Other reasonable doubt can exist.

*Id.* at 711.

After the prosecutor made this remedial statement to the jury, defense counsel did not object. In light of defense counsel's admission that a corrective statement

would be acceptable and his failure to further object, we must assume that this statement was acceptable to him. Since defense counsel failed to object when the government rephrased its argument, we can consider the error only if it constitutes plain error. A plain error is one that results in "an actual miscarriage of justice." *United States v. Silverstein,* 732 F.2d 1338, 1349 (7th Cir.1984), *cert. denied,* 469 U.S. 1111, 105 S.Ct. 792, 83 L.Ed.2d 785 (1985).

In *United States v. Vargas,* 583 F.2d 380 (7th Cir.1978), we held that a comment, similar to the one complained of here, was error. In *Vargas,* however, defense counsel's objection to the rebuttal argument was overruled and no curative statement was given. In contrast, in the instant case, the trial court's prompt response to defendant's objection and the government's remedial statement to the jury helped to mitigate any harm that might have resulted from the government's improper comment. We further note that the government's improper remark lasted for only a brief moment during the lengthy closing argument. *See Ramsey v. American Air Filter Co.,* 772 F.2d 1303, 1311 (7th Cir.1985); *Canada Dry Corp. v. Nehi Beverage Co.,* 723 F.2d 512, 527 (7th Cir.1983). The evidence against the defendant was overwhelming; it included substantial eyewitness testimony by the police as well as the cocaine that was seized. *United States v. Mazzone,* 782 F.2d 757, 764 (7th Cir.), *cert. denied,* 479 U.S. 838, 107 S.Ct. 141, 93 L.Ed.2d 84 (1986). No miscarriage of justice occurred.

Appellant also contends that the government further erred during closing argument by telling the jurors to disregard the presumption of innocence. While we agree with the defendant that a Golden Rule argument is never proper, we find this error did not deprive the defendant of a fair trial.

In his rebuttal argument, the prosecutor stated:

> You heard the testimony of the police officers, and Mr. Teslim was advised that he could stay with his luggage while the

drug dog was brought to the scene or he could leave. I ask you, ladies and gentlemen, *if it happened to you and you had nothing to hide* —

4 Tr. 714 (emphasis added). The defense promptly objected by referring to the Golden Rule, and the judge sustained the objection.

"A 'Golden Rule' appeal in which the jury is asked to put itself in the plaintiff's position 'is universally recognized as improper because it encourages the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence.'" *Spray–Rite Serv. Corp. v. Monsanto Co.,* 684 F.2d 1226, 1246 (7th Cir.1982), *aff'd,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) (quoting *Ivy v. Security Barge Lines, Inc.,* 585 F.2d 732, 741 (5th Cir. 1978), *rev'd on other grounds,* 606 F.2d 524 (5th Cir.1979) (en banc), *cert. denied,* 446 U.S. 956, 100 S.Ct. 2927, 64 L.Ed.2d 815 (1980)). The government should not have asked the jurors to put themselves in defendant's position. Although we find that the prosecutor's comment was improper, we believe that it was not so prejudicial as to deprive the defendant of his right to a fair trial. The defense promptly objected to the remark, and the court sustained the objection. The government then immediately rephrased its argument to the jury. We also note that this remark lasted for only a brief moment during an hour-long rebuttal argument. While we do not condone the government's comment, we hold that it was not reversible error. Although the appellant asserts that other errors occurred at trial, we have addressed those issues in this opinion that have sufficient merit to warrant our attention. Other asserted issues are of insufficient significance to warrant further discussion.

### VI.

Therefore, in conclusion we hold that: (1) The police had reasonable, articulable suspicion to detain Teslim for a brief, investigatory stop at the airport; (2) The detention of defendant's luggage was brief and conformed to the requirements of the fourth amendment; (3) The drug courier profile testimony was properly presented to the jury because it was relevant to defendant's guilt or innocence and to establishing the chain of custody of the carry-on bag; (4) There was sufficient evidence in the record to support the jury's verdict of conviction and the conspiracy offense was necessarily included in the greater offense of conspiracy to possess and to distribute more than 500 grams of cocaine; (5) Any errors that occurred at trial were harmless and did not deny the defendant a fair trial. Accordingly, the defendant's conviction is

AFFIRMED.