124 F.3d 205
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
United STATES of America, Plaintiff-Appellee,
v.
Terranced D. Daniels, Defendant-Appellant.
 No. 97-1345.
 United States Court of Appeals, Seventh Circuit.
 July 21, 1997.
 
 1
 Appeal from the United States District Court for the Central District of Illinois
 
 ORDER
 
 2
 Terrance D. Daniels pleaded guilty to possession of crack cocaine with intent to distribute it, 21 U.S.C. § 841, while reserving his right to appeal the district court's denial of a motion to suppress evidence of the drugs seized from his car as the result of a traffic stop. Because the arresting officers realized, based on their prior contacts with Daniels, that his behavior during the traffic stop was highly uncharacteristic, they had a reasonable and articulable suspicion that something was amiss. That suspicion justified transforming the traffic stop into an investigative stop. Therefore, we affirm.
 
 I.
 
 3
 On the afternoon of June 19, 1996, police officer Kevin Hanson, a "gang specialist," was monitoring traffic on North Market Street in Champaign, Illinois. Market Street is a major artery leading to a regional shopping mall. It is also known to Champaign police as a route frequently used by drug couriers, who bring drugs south from Chicago along Interstate 57, and then drive south on Market Street into an area of Champaign which is a major drug-dealing area of the city.
 
 
 4
 Hanson's radar spotted a car headed south, driving fifty-one miles per hour in a forty mile per hour zone. He followed the car for a while without activating his siren, and then pulled the car over for speeding. The driver of the car was Terrance Daniels; his passenger was Shance Dalton. Daniels and Dalton were not unknown to Officer Hanson. Hanson later testified that he had previously had contact with both men some twenty or thirty times in the course of his duties, and that on these occasions, they were hostile, confrontational, and uncooperative, and laced their comments toward the police with expletives. Not so on this occasion. Daniels was apologetic, respectful, and cooperative as Hanson informed him that he had been speeding, and then took his license and insurance card back to his squad car to check their validity. Hanson also noted that in contrast to his usual aggressive behavior, Daniels appeared nervous, constantly fluttering his hands, fidgeting, and darting his eyes about. Daniels maintains that he was nervous because he is a small and slightly built black teenager who, by the end of the incident, found himself surrounded by four large policemen.
 
 
 5
 While Hanson was processing the license and insurance card and preparing a speeding citation, Sergeant John Murphy and two other police officers--all members of Champaign's Gang Tactical Unit--arrived at the scene. Sergeant Murphy, who commanded the Gang Tactical Unit, took charge. Murphy had also had numerous previous contacts with Daniels and Dalton, both of whom were known to him as members of the Gangster Disciples. Murphy had known Dalton since Dalton was a child, and he had almost daily contact with Daniels in the course of his duties. In fact, about three weeks previously, he had stopped a car wanted as part of an ongoing drug investigation; Daniels turned out to be the driver. (Daniels was not arrested.) Murphy approached the passenger's door while two other officers, standing by the driver's door, engaged Daniels and Dalton in conversation. Murphy observed that both men not only appeared very reserved and cooperative, but also preoccupied, fidgety and nervous. Murphy thought that Daniels seemed anxious to end the encounter and get away. He deemed this to be highly uncharacteristic behavior, and it made him suspicious. As a result of these suspicions, Murphy decided that he wanted to investigate the situation further, and called a canine handler to bring a drug-sniffing dog to the scene. Murphy later testified that because his suspicions had been aroused, he did not consider Daniels free to leave the scene after Officer Hanson issued the speeding ticket to him.
 
 
 6
 When Officer Hanson finished filling out the speeding ticket, he asked Daniels to step out of the car, in order to explain the citation to him. Daniels complied. He did not speak unless Hanson asked him a question, and then responded quickly and concisely. Hanson found these responses uncharacteristic of Daniels' usual behavior. He asked Daniels if he was carrying any drugs or guns. Daniels said he was not. Hanson asked for permission to search the car. Daniels refused. Hanson then asked Daniels where he had been. Daniels responded that he and Dalton had been fishing. When Hanson asked where their fishing poles and equipment were, Daniels hesitated and stuttered for several seconds before stating that he had a friend who rented them equipment.
 
 
 7
 When the canine handler and his dog arrived, Daniels reiterated that he was not giving the police permission to search his car. Sergeant Murphy told Daniels that they weren't going to search the car, just have the dog do a walk-around. Daniels then indicated that it wasn't his car, and he didn't know what was in it. During the walk-around, the dog reacted positively to the presence of a controlled substance, and the canine handler told the other officers that they could search the car. Sergeant Murphy found what proved to be 493 grams of crack cocaine concealed in an apparently unopened Kleenex box under the driver's seat. Daniels and Dalton were arrested.
 
 
 8
 Daniels was charged by indictment with one count of possessing cocaine with intent to distribute it. He filed a motion to suppress the evidence of the crack cocaine found in the search of his car, on grounds that the search violated the Fourth Amendment because the police lacked reasonable suspicion to detain him after the traffic stop. Following a hearing, the district court denied the motion, ruling that the officers' suspicions of Daniels' behavior properly transformed the traffic stop into an investigative detention. Daniels then entered a conditional guilty plea to the indictment. He reserved his right to challenge the district court's denial of his motion to suppress. At sentencing, Daniels objected to the increased penalty under the Sentencing Guidelines for distributors of crack cocaine, as opposed to cocaine base. He argued that the penalty had a disparate impact on African-Americans, and therefore violated the Equal Protection Clause. The court overruled the objections, and sentenced Daniels to 108 months in prison, followed by three years of supervised release. Daniels appeals the denial of the motion to suppress.
 
 II.
 A.
 
 9
 Daniels argues that the police had no grounds to detain him after the issuance of the speeding ticket and therefore, under the exclusionary rule, the evidence of the drugs seized in the search of his car must be suppressed. Wong Sun v. United States, 371 U.S. 471 (1963). Daniels concedes that the initial traffic stop was justified. The police, however, decided that Darnels was not free to go following the issuance of the speeding ticket. As a result, the reasonableness of the officers' decision to detain Daniels for further investigation is governed by the principles set forth in Terry v. Ohio, 392 U.S. 1 (1968) and its progeny. An investigatory stop, "limited to a brief, non-intrusive detention," is justified as long as the police have "specific and articulable facts sufficient to give rise to a reasonable suspicion that a person has committed or is committing a crime." United States v. Odum, 72 F.3d 1279, 1283 (7th Cir.1995); see also United States v. Sokolow, 490 U.S. 1, 7 (1989). Reasonableness "is measured in objective terms by examining the totality of the circumstances." Ohio v. Robinette, 117 S.Ct. 417, 421 (1996). We review the district court's determination of reasonable suspicion de novo, and its findings of historical fact for clear error. Ornelas v. United States, 116 S.Ct. 1657, 1663 (1996).
 
 
 10
 Daniels' argument boils down to a claim that the arresting officers either failed to articulate sufficient facts to demonstrate that reasonable suspicion to detain him existed, or that the facts they did articulate are subject to alternative explanations. There was no direct evidence, for example, that Daniels was traveling from a drug source, and police stopped him before they could determine whether he was headed into the part of Champaign known for drug dealing. Merely traveling along a well-traveled highway in broad daylight, Daniels argues, is not cause for suspicion. United States v. Tapia, 912 F.2d 1367, 1370-71 (11th Cir.1990). And the officers description of his nervousness--fidgeting, fluttering hands, darting eyes--were too vague, Daniels continues, to support a reasonable suspicion of criminal activity. Compare United States v. Withers, 972 F.2d 837, 843 (7th Cir.1992); and United States v. Teslim, 869 F.2d 316, 323 (7th Cir.1989). According to Daniels, a more reasonable explanation for any such nervousness is the plain fact that Daniels, a slightly built nineteen-year-old, found himself surrounded by a group of five large policemen. Finally, Daniels maintains that it is preposterous for the police to insist that a motorist's deferential and cooperative behavior roused their suspicions. Why, he argues, should he be detained when he was behaving politely and cooperatively, when he was never arrested on those occasions when he acted in a cocky and disrespectful manner?
 
 
 11
 Under normal circumstances, one would think that being polite and cooperative to police officers is a decent way to handle matters. Indeed, we encourage motorists to act in such a manner during traffic stops, as we encourage greater civility in all aspects of public life. Had Daniels been a stranger to the arresting officers, their claim that his respectful and deferential behavior aroused their suspicions would be ludicrous--and, more importantly, would eviscerate the protection which the "reasonable suspicion" standard affords innocent motorists. But Daniels was not a stranger. Daniels never denied that he was well known to Hanson and Murphy. Neither did he refute their testimony that he was habitually hostile, confrontational, and obstreperous in his previous interactions with the police, other than wringing a concession from Sergeant Murphy that although he had never seen Daniels behave in the manner he did during the incident in question here, Daniels was not always verbally combative. And by parsing out the facts and analyzing them one by one, Daniels conveniently ignores the fact that courts examine not the parts but the whole. Factors which may be insufficient standing alone, the Supreme Court teaches, may nonetheless arouse a reasonable suspicion when taken as a whole. Sokolow, 490 U.S. at 9: United States v. Green, 111 F.3d 515, 519 (7th Cir.1997).
 
 
 12
 In particular, the courts recognize that "in forming [his] suspicions, [a police officer is] entitled to assess the circumstances and the defendants' behavior in light of his experience as a police officer and his knowledge of drug courier activity." United States v. Finke, 85 F.3d 1275, 1280 (7th Cir.1996); ornelas, 116 S.Ct. at 1663. Indeed, Officer Hanson's and Sergeant Murphy's conclusion that Daniels was acting in a highly uncharacteristic, and therefore suspicious, manner is precisely the sort of "inference drawn from [the] facts by ... local law enforcement officers" to which we traditionally give great deference. United States v. Stribling, 94 F.3d 321, 323 (7th Cir.1996).
 
 
 13
 Finally, Daniels disregards the fact that the district court found the officers' version of events credible. "An appeals court should give due weight to a trial court's finding that the officer was credible and the inference was reasonable." Ornelas, 116 S.Ct. at 1663. Consequently, while the same incident and identical behavior might not have roused suspicion had the driver of the car proved to be a stranger to the arresting officers, under the peculiar circumstances of this case, the officers' previous experiences with Daniels, and their ability to compare his past behavior to his behavior during the incident in question, were sufficient to arouse the necessary suspicion that something was amiss. That suspicion, in turn, gave them leeway to expand the scope of the traffic stop into an investigative detention. United States v. Barahona, 990 F.2d 412, 416 (8th Cir.1993). Because he never raises the question in his appellate brief, Daniels apparently concedes that if the decision to make an investigative stop was justified, the decision to have a trained narcotics detection dog perform a sniff test, which "involves only minimal intrusion into a person's privacy," was not outside the boundaries of the Fourth Amendment. United States v. Teslim, 869 F.2d 316, 323 (citing United States v. Place, 462 U.S. 696, 706-07 (1983)). The dog's positive reaction gave the police probable cause to search the car without Daniels' consent. Consequently, the cocaine seized in the subsequent search of Daniels' vehicle was not "fruit of the poisonous tree," and was admissible as evidence against him.
 
 B.
 
 14
 Daniels also raises the tired argument that the greater punishment for distribution of crack cocaine, as compared to pure cocaine, violates the Equal Protection Clause of the Fourteenth Amendment. He maintains that Congress had no rational basis for making such a distinction. We have rejected this argument, and the rationale for it, time and again. United States v. Lawrence, 951 F.2d 751, 755 (7th Cir.1991); United States v. Stowe, 100 F.3d 494, 501 (7th Cir.1996). Darnels adds nothing new to the debate, and we summarily reject his argument.
 
 
 15
 AFFIRMED.