**UNITED STATES of America, Plaintiff–Appellee,**

**v.**

**Fenet JARAMILLO and Esther Jaramillo, Defendants–Appellants.**

Nos. 89–1954, 89–1955.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 28, 1989.

Decided Dec. 12, 1989.

Thomas M. Durkin, Colleen D. Coughlin (argued), Asst. U.S. Attys., Office of the U.S. Atty., Chicago, Ill., for U.S.

Philip Krasny (argued), Schlesinger & Krasny, Chicago, Ill., for Fenet Jaramillo.

Lauren J. Weil (argued), Federal Public Defender, Office of the Federal Public Defender, Chicago, Ill., for Esther Jaramillo.

Before POSNER and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

Esther and Fenet Jaramillo tried to smuggle about 2,000 grams (approximately 4.4 pounds) of cocaine through Chicago's O'Hare Airport. They were caught and the cocaine was discovered and confiscated. The Jaramillos subsequently were charged by indictment with violations of 21 U.S.C. § 846 (Count One), 21 U.S.C. § 841(a)(1) (Count Two), and 18 U.S.C. § 1952 (Count Three). Before trial, they moved to suppress from evidence the confiscated cocaine and certain statements made by them subsequent to the seizure. The district court denied the motions, finding that the cocaine was lawfully seized. 714 F.Supp. 323. Thereafter the Jaramillos entered a plea agreement in which they pled guilty to violating Counts One and Two of the indictment. Each was sentenced on Count One to serve five years in jail. On Count Two each received a sentence of 20 years in jail followed by 10 years of supervised release, but the sentences were suspended and in lieu thereof each was placed on probation for five years, to run consecutively to the custody sentence on Count One, and was subjected to various other conditions. A provision in the Jaramillos' plea agreement reserved to them the right to appeal the denial of their suppression motions. They have exercised that right.

## I.

The events transpiring at O'Hare were hotly disputed. The scenario portrayed here comes from the district court's findings, findings that must stand on review unless clearly erroneous. *United States v. Talkington*, 875 F.2d 591, 593 (7th Cir. 1989); *United States v. $73,277, United States Currency*, 710 F.2d 283, 288 (7th Cir.1983). When and if the need arises to discuss views different from those described or adopted by the district court, those views will be presented and addressed. For the time being, however, we take our story as told by the trial judge.

Esther and Fenet Jaramillo are married, middle aged (Esther is about 57, Fenet, 56) Miami residents. Both emigrated from Colombia and came to the United States, Esther coming in 1982, Fenet in 1964. Fenet attended high school in Colombia, and speaks both Spanish and English well. He is five feet five inches tall and weighs about 132 pounds. He was employed as an exterminator in Miami. Esther completed her education through the second year of Colombian secondary school, and has registered for classes in the United States several times. She speaks fluent Spanish, not so fluent English. She is not quite as tall as Fenet, and has somewhat of a larger build. She was employed as a seamstress in Miami. Neither had been arrested before September 28, 1987, nor had they ever visited Chicago's O'Hare airport.

On that date, however, the Jaramillos decided to take an Eastern Airlines flight from Miami to Chicago. They purchased their tickets the same day as the flight, in cash, in their own names, with open return dates for the trip back to Miami. Before leaving, they packed some personal effects into their luggage; Fenet took a carry-on bag, Esther, a purse. They also packed some cocaine (about 4.4 pounds) into eleven four-by-six packages; Fenet took five of the packages, Esther, six. They wrapped the cocaine packages in white tape, securing them to their waists with rubber waistbands. They then covered the cocaine with their clothing, caught their flight, and headed for Chicago.

At O'Hare, narcotics agents George Mays and Robert Glynn were monitoring incoming flights from "source" cities, one of which is Miami. Agent Mays was a Chicago Police Department veteran of 26

622

years, the last 19 of which were spent in narcotics enforcement. He was working for the Drug Enforcement Agency O'Hare task force, as he had been for the previous three years. The agents had substantial experience with drug couriers—Mays alone had been involved in about 400 narcotics interviews while at O'Hare, 100 of those resulting in the seizure of illegal drugs, 50 of which involved the concealment of drugs on the interviewee's body—and had received extensive education and training on interviewing suspected narcotics couriers. Both agents were dressed in plain clothes.

The Jaramillos' flight arrived at 4:30 in the afternoon. As the Jaramillos deplaned they began looking about the immediate area. This caught Agent Mays's eye, as did the Jaramillos' bodies, which were bulky and abnormally formed. The Jaramillos' visual search of the gate area reminded Mays of "a type of counter surveillance" usually engaged in by drug couriers. Their bulkiness indicated to him that they were "possible couriers of contraband." Agent Mays noticed that the unusual bulkiness concentrated around the Jaramillos' waists, bulges protruding from Esther's front and back and from Fenet's front, back, and side. This raised his suspicions further; his experience had been that drug couriers commonly smuggle drugs concealed on their waists. Mays also noticed the Jaramillos' paucity of baggage. To him this indicated a short trip (potentially, if no other luggage was picked up at baggage claim), a short trip being the norm for drug couriers.

After the Jaramillos scanned the area around their arrival gate, they began to walk quickly down "D" concourse. Mays and Agent Glynn fell in behind them, back 10 to 15 feet. Several times the Jaramillos turned and made eye contact with the agents. At the end of D concourse, before entering the main terminal, the Jaramillos turned, looked at Mays and Glynn, and nervously backtracked up the concourse. After about 50 yards of walking and watching the agents they again changed course, heading back to the terminal. Once there the Jaramillos got in line for the escalator leading to baggage claim and the lower

level exit doors. They stood about 10 persons back. The agents joined them in line about 13 persons back. When the Jaramillos were about three persons from entering the escalator, Fenet turned and saw the agents. He grabbed Esther and left the line, heading for the upper level exit doors. The agents pursued at a quickened pace.

They caught up with the Jaramillos inside the terminal about 25 to 30 feet from the escalator line. The agents flanked the couple on their right side, produced their badges and identification and stated in a normal tone of voice, "Excuse me, we are police officers." They did not display their weapons. They did not touch the Jaramillos. They did not block the Jaramillos' path to the exit doors. They did not order the Jaramillos to stop. Fenet responded, "What can I do for you?" Agent Mays asked if the Jaramillos would speak to him, informing them that they were not under arrest and were free to go at any time. The Jaramillos said "yes," in English, and stopped in the vestibule area between two sets of exit doors.

The vestibule area is about 15 by 20 feet, containing one set of exit doors segregated by a metal bar from two sets of entrance doors. Across from the metal bar, along the exit side, lies a radiator. A sensory pad extends into the area, the pad opening sliding doors when activated. The vestibule enclosure is made of glass walls that are fairly clear for Chicago. It is well lit. It is well traveled by airport visitors. As a large number of people were then exiting through the doors, the agents and the Jaramillos gravitated to the side.

The agents requested the Jaramillos' airline tickets and identification and received them. They were perused for a minute or so and returned. The agents noticed that the tickets were purchased at the last minute before the flight. This raised their suspicions; to their knowledge couriers attempt to hide their movements by making last minute ticket purchases. Also in the drug courier norm was the use of cash and the open return date, again, both helpful means to conceal information on courier whereabouts. Agent Mays asked the Jar-

amillos about their visit to Chicago, and Fenet replied that they were staying in town for a few days.

Agent Mays then told the Jaramillos that he was a narcotics agent conducting a narcotics investigation, asked permission to search their baggage for narcotics, and informed them that they had a right to refuse consent. Fenet conferred with Esther momentarily in Spanish. Consent was then given by Fenet. Agent Mays addressed Esther, asking her if she was giving consent. Esther responded, "Yes," in English. A cursory search of the carry-on bag and the purse was performed, the search being uneventful. During this time, however, the agents had further opportunities to observe the Jaramillos' bulkiness, now at close range. These observations led Agent Mays to believe that the Jaramillos were concealing drugs or other contraband under their clothes.

To verify his suspicions, Mays asked the Jaramillos in English if they were carrying drugs. Fenet responded, "No." Esther made no response. Mays then pointed to the Jaramillos' waists and said in English, "You have something bulky on your waist. What is that?" The Jaramillos did not respond. He then asked them if they would consent to a pat-down search. After conferring momentarily in Spanish, the Jaramillos effectively refused.

The agents decided to pat the couple down anyway. Concerned about Mrs. Jaramillo's rights, Agent Mays went looking for assistance from a female agent. He left the Jaramillos temporarily with Agent Glynn and found narcotics agent Christine Kolman to assist him. Agent Kolman was a 14 year veteran of the Chicago Police Department, the last 13 of those years an officer working narcotics. She had participated in about 250 airport stops, 50 of which resulted in the seizure of drugs and 15 of those involving drugs concealed on an interviewee's body. She was dressed in plain clothes. When the two returned, Agent Kolman showed her badge and identification, and informed the Jaramillos that she was a police officer. She then solicited in both English and Spanish Esther's con-sent for a pat-down search, which, again, effectively was refused.

Kolman noticed that the Jaramillos were unusually large around the waist area, bulges protruding from their sides. She attempted to touch Esther's waist with her hand but Esther moved away, complaining of stomach problems. Kolman stated that she thought Esther was carrying drugs around her waist. She then touched Esther's waist. Kolman felt something hard underneath Esther's blouse, something solid with an edge. She observed that Esther was extremely nervous, trembling slightly. She asked if the hard object was a gun or drugs. Esther explained that she was wearing a girdle. This explanation Kolman refused to buy; she knew from personal experience that what she felt was not a girdle. She stated that she wanted to see what Esther had on. Esther said nothing.

At this point, Fenet spoke up, suggesting that the encounter continue in a more private area. The agents suggested the airport washrooms, and the Jaramillos agreed. Once there, Esther was searched inside by Kolman and Fenet was searched outside by Mays. The searches resulted in the discovery of the cocaine packages held on the Jaramillos' waists, and the Jaramillos were put under formal arrest. The total time elapsing from initial encounter outside the vestibule to pat-down search around the washroom was 15 minutes.

Before construing the legality of these events, the district court referred the matter to a magistrate. From the suppression hearing, the magistrate found that the initial police-citizen encounter between the narcotics agents and the Jaramillos was a consensual encounter. The consensual encounter ended, however, a seizure having evolved, when the agents asked the Jaramillos to consent to patdown searches. The magistrate noted that the seizure—a *Terry* or investigative stop—was reasonable in duration, and he found it justified by reasonable suspicion, but he did not find it reasonable in scope, concluding that it changed into an arrest when the pat-down searches were initiated. Because the government had not argued that those

searches (which led to the seizure of the cocaine) were supported by probable cause—relying instead on a rejected consent theory—the magistrate recommended that the seized cocaine be suppressed.

Subsequent to the promulgation of the magistrate's proposals, the government filed a motion for reconsideration asking that the magistrate hear, for the first time, an argument that probable cause to arrest existed at the time of the searches. The magistrate denied the government's motion, finding that its failure to present the argument at the outset resulted in a waiver. Both sides then filed objections to the magistrate's proposals and the case moved on to district court. In a written memorandum opinion and order the district court adopted, in essence, the proposed findings of fact and conclusions of law made by the magistrate. It did not, however, adopt the magistrate's recommendation for the motions to suppress. The court instead chose to entertain the government's argument that probable cause existed at the time of the searches and found itself persuaded that probable cause did exist, making the searches lawful.

It is from the district court's findings, and the resulting denial of their motions to suppress, that the Jaramillos appeal. They raise five issues for this Court's consideration, four relating to the fourth amendment, one relating to the district court-magistrate relationship. The issue relating to the district court-magistrate relationship is whether the district court erred in entertaining an argument by the government when the magistrate had concluded that it was "waived." The issues relating to the fourth amendment concern alleged errors by the district court in concluding the following: (1) that the initial encounter between the Jaramillos and the agents in the vestibule area was consensual; (2) that the *Terry* stop was reasonable in duration; (3) that the agents had a reasonable basis for suspecting the Jaramillos of criminal activity at the time of the *Terry* stop; and (4) that the agents had probable cause to arrest the Jaramillos at the time they were searched. These issues raise questions of constitutional proportion. We focus on the fourth amendment, beginning our analysis with that provision's text.

## II.

The fourth amendment to the United States Constitution states in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. The amendment is straightforward, expressing the ideal of a citizenry free from "arbitrary and oppressive" government interference. *United States v. Martinez–Fuerte*, 428 U.S. 543, 554, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116 (1976); *United States v. $73,277, United States Currency*, 710 F.2d 283, 289 (7th Cir.1983). It makes several points worthy of consideration here, particularly that the people have a right to be secure in their persons from unreasonable searches or seizures, and, consequently, that unreasonable searches or seizures are prohibited. Also worthy of consideration is what the amendment does not prohibit, *i.e.*, encounters between citizens and the government that are not "searches or seizures" at all, *see Florida v. Royer*, 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality), and searches or seizures that are not at all "unreasonable." *See Michigan v. Summers*, 452 U.S. 692, 699–700 & n. 12, 101 S.Ct. 2587, 2593 & n. 12, 69 L.Ed.2d 340 (1981). Any examination of an airport encounter like the one before us, therefore, should start with two general inquiries: Was the aggreived individual seized; and if so, was the seizure unreasonable. *See, e.g., $73,277, United States Currency, supra*, at 288.

### A. Seizure

That a seizure occurred in this case is beyond dispute. The court below found one at the time the Jaramillos were asked to consent to pat-down searches, and that finding has not been challenged. What the Jaramillos do challenge is the court's conclusion that they were not seized before, when they and the agents first converged

in the vestibule. They argue that their initial encounter with the narcotics agents cries out for fourth amendment "exclusionary" protection.

Police-citizen encounters, however, are not always within the orbit of the fourth amendment. Events occurring before an encounter ripens into a seizure are unprotected. Accordingly, the threshold inquiry in a case such as this one is if and when a seizure occurred. *United States v. Teslim,* 869 F.2d 316, 321 (7th Cir.1989); *United States v. Borys,* 766 F.2d 304, 308 (7th Cir.1985), *cert. denied,* 474 U.S. 1082, 106 S.Ct. 852, 88 L.Ed.2d 893 (1986). Our reading of pertinent cases makes clear that this inquiry—the "seizure" inquiry—is not one amenable to easy resolution. Police-citizen encounters run the gamut from friendly conversation to violent incarceration; a decision declaring where along this continuum a seizure falls is hardly one of syllogistic certainty.

■ Fortunately, we do not face such a difficult inquiry bereft of conceptual tools. Prior cases have crafted legal doctrine with which we initially may type the wide variety of airport interaction into either consensual encounters or seizures. In a consensual encounter the " 'voluntary cooperation of the citizen is elicited [by the police] through non-coercive questioning' " and the facts and circumstances are such that " 'no restraint of the liberty of the citizen is implicated.' " *Teslim, supra,* at 321 n. 6 (quoting *United States v. Black,* 675 F.2d 129, 133 (7th Cir.1982), *cert. denied,* 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983)). A person is "seized," on the other hand, when "in view of all the circumstances surrounding the [police-citizen] incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (plurality) (Stewart, J., concurring); *Black,* 675 F.2d at 133.

■ The question here, then, is whether the district court's conclusion about the consensual nature of the Jaramillos' initial encounter with the agents is correct. The court below used the proper law to frame its seizure analysis, and it emphasized that it would examine the totality of the circumstances. Looking at the police behavior, the court could discern no oppression, no coercion, no implied threats used against the Jaramillos. Looking at the physical surroundings, the court could discern no aura of uncomfortableness, no suggestion of an environment transpiring with restraint. Looking at the Jaramillos' individual characteristics, the court could discern no evidence of anything but two mature persons engaging in consensual discourse with police officers. In light of these discernments, the court found that a reasonable person in the same circumstances as the Jaramillos would have felt free to leave—would have felt unrestrained—until that point in time when the agents requested the Jaramillos' consent to pat-down searches. At that point in time, the court concluded, the agents' communications and actions rose to the level where a reasonable person would not have felt free to go his merry way. But until that point in time, the encounter between the agents and the Jaramillos remained a consensual one.

We conclude that the district court was correct. As our summary of the facts confirms, this was not a situation where a reasonable person facing the Jaramillos' circumstances would have felt restrained from taking his leave. We find that the totality of circumstances involved in the initial encounter shows it to be consensual.

This conclusion disposes of the Jaramillos' argument that the intial encounter resulted in a seizure. It also disposes of the Jaramillos' argument that the seizure, when it occurred, was unreasonable in duration. That argument assumes that they were seized when they initially encountered the agents and that this seizure was a *Terry* stop. *See generally Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). With that assumption, the Jaramillos argue that once they responded to the agents' request for tickets, identification, and travel information they should have been excused and, consequently, that the failure to do so converted the investigation into a full-fledged arrest. *See Florida v.*

*Royer,* 460 U.S. at 500, 103 S.Ct. at 1325–26. In view of our agreement with the district court that a seizure did not occur until the Jaramillos were asked to consent to pat-down searches, however, this reasonable duration argument is moot. The period of time in which the agents interviewed the Jaramillos before the seizure is simply of no consequence to a determination of whether the *Terry* stop occurring thereafter was reasonable in duration.

■ The district court concluded that the period of time between the *actual* seizure and the arrest could not have taken more than a few minutes of time. Under the circumstances present, we do not find this to be an unreasonable duration for the *Terry* stop.

### B. Reasonableness

The district court found that a *Terry* stop occurred when the agent's posed their pat-down request. The district court also found that the *Terry* stop evolved into an arrest when Agent Kolman initiated the pat-down search by touching Mrs. Jaramillo against her will. The question for us to resolve is whether these seizures—the *Terry* stop and the arrest—were reasonable.

Cases involving a reasonableness inquiry point us to the use of a balancing test. *See, e.g., United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983); *United States v. Borys,* 766 F.2d at 308. Our determination here is ultimately resolved by weighing competing interests. *See Michigan v. Summers,* 452 U.S. at 700 n. 12, 101 S.Ct. at 2593 n. 12. *Cf. Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983) (describing process involved in a probable cause inquiry as one in which evidence "must be seen and weighed"). On one scale we place the individual's expectation of privacy, on the other, the government's need to encroach upon that expectation. *United States v. Boden,* 854 F.2d 983, 992 (7th Cir.1988); *United States v. Serna–Barreto,* 842 F.2d 965, 966 (7th Cir.1988).

This balancing takes place in a two-step process. In the first step we categorize the seizure as either a *Terry* stop or an arrest. "An arrest is a profound and deeply resented interference with the liberty of a citizen," *Serna–Barreto, supra,* at 966, " 'characterized by highly intrusive or lengthy search or detention.' " *Teslim,* 869 F.2d at 320–21 n.6 (quoting *Black,* 675 F.2d at 133). A *Terry* stop is less intrusive than an arrest, *see Boden, supra,* at 992–936 it is a seizure " 'limited to brief, non-intrusive detention during a frisk for weapons or [during] preliminary questioning.' " *Teslim, supra,* at 321 n. 6 (quoting *Black,* 675 F.2d at 133). In the second step we categorize the degree of police suspicion necessary to justify the particular seizure. For an arrest, that degree of suspicion is probable cause, which exists when police have "facts and circumstances within their knowledge and of which they [have] reasonably trustworthy information [that are] sufficient to warrant a prudent man in believing that the [arrested person] had committed or was committing an offense." *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964); *United States v. McCarty,* 862 F.2d 143, 147 (7th Cir. 1988). For a *Terry* stop, that degree of suspicion is much less, because the infringement of the individual's realm of protected privacy is much less. "[T]he Fourth Amendment requires [only] that reasonable suspicion support [*Terry* ] stops," *Borys, supra,* at 308, reasonable suspicion existing when police have facts and circumstances "considerably less than [that needed to prove] wrongdoing by a preponderance of the evidence." *United States v. Sokolow,* —— U.S. ——, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989).

■ Because we review *de novo* the district court's judgment on probable cause, *United States v. Patino,* 862 F.2d 128, 132 (7th Cir.1988) *cert. denied,* —— U.S. ——, 109 S.Ct. 2072, 104 L.Ed.2d 637 (1989); *United States v. Lima,* 819 F.2d 687, 688 (7th Cir.1987), as we do its judgment on reasonable suspicion, we must have before us facts from which a feeling of suspicion can flow. *See generally Terry v. Ohio, supra,* 392 U.S. at 21, 88 S.Ct. at 1880 ("The scheme of the Fourth Amendment becomes meaningful only when it is as-

sured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge."). Thus, suspicion must be supported by cold, hard, "articulable" facts. *See Black*, 675 F.2d at 133; *Borys, supra*, at 308. To justify the seizure of a citizen an officer "must be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch." ' " *Sokolow, supra*, —— U.S. at ——, 109 S.Ct. at 1585 (quoting *Terry, supra*, 392 U.S. at 27, 88 S.Ct. at 1883).

■ The record shows that among the facts articulated in support of both the *Terry* stop and the arrest were the following: (1) the Jaramillos had arrived on a flight from Miami (which is a "source" city for drugs); (2) the Jaramillos had purchased their ticket for that flight in cash, the same day of the flight, and with an open return date (such activity being standard operating procedure for drug smugglers); (3) the Jaramillos carried little luggage, their path of exit indicating that all they possessed were the carry-on bag and purse (showing a short trip, which is normal for drug couriers); (4) the Jaramillos, after they debarked, had scanned the airport environs "as if to conduct countersurveillance"; (5) the Jaramillos had taken "a suspicious path" through the concourse, doubling-back after noticing the agents; and (6) the Jaramillos had left the escalator line after becoming aware of the agents, "as if to avoid detection." These facts are comparable to those found in similar cases where reasonable suspicion has been held to exist. *See Teslim, supra; United States v. Espinosa–Alvarez*, 839 F.2d 1201 (7th Cir.1987); *United States v. Palen*, 793 F.2d 853 (7th Cir.1986); *Borys, supra; United States v. Cordell*, 723 F.2d 1283 (7th Cir.1983), *cert. denied*, 465 U.S. 1029, 104 S.Ct. 1291, 79 L.Ed.2d 693 (1984); *United States v. $84,000, United States Currency*, 717 F.2d 1090 (7th Cir.1983), *cert. denied, Holmes v. United States*, 469 U.S. 836, 105 S.Ct. 131, 83 L.Ed.2d 71 (1984); *$73,277, United States Currency*, 710 F.2d 283. Also articulated and of crucial import: the Jaramillos both had an unusual bulkiness around their waists. In-

deed, the agents were able to scrutinize at close range bulges protruding from the front, back, and sides of the Jaramillos' midsections. An observed bulge or bulkiness suggesting the smuggling of contraband has alone and with other facts been held to support a reasonable suspicion of crime. *See United States v. Rieves*, 584 F.2d 740, 744 (5th Cir.1978); *United States v. Elsoffer*, 671 F.2d 1294, 1297 (11th Cir. 1982).

Our interpretation of the encounter leads us to conclude that reasonable suspicion of criminal activity existed when the Jaramillos were seized. Moreover, we conclude that existing also at that time was probable cause to arrest. The bottom line is that a prudent, reasonable person would have believed that the Jaramillos were smuggling drugs. The bulkiness of their bodies, the evasiveness of their path, the congruousness of their characteristics with those of the drug courier profile: all the facts pointed to the Jaramillos as surreptitious drug transporters. This conclusion is supported by a common sense look at the "totality of the circumstances." It also comports with the overwhelming number of judgments reached in similar cases. *See, e.g., United States v. Tomaszewski*, 833 F.2d 1532 (11th Cir.1987) (bulge and evasive action provided probable cause to arrest and search defendant); *United States v. Lehmann*, 798 F.2d 692 (4th Cir.1986) (bulge, evasive tactics, and drug smuggler "modus operandi" provided probable cause to believe illegal activity was taking place); *Palen, supra* (agent, upon noticing bulge, had probable cause to believe bulge contained illegal drugs and probable cause to search and arrest the defendant); *United States v. Ilazi*, 730 F.2d 1120 (8th Cir.1984) (probable cause existed when defendant refused to explain bulge on the inside of his boot); *Elsoffer, supra* (unusual size and shape of bulge and its abnormal position on defendant's body "provided not only reasonable suspicion but also probable cause for [defendant's] arrest").

Probable cause being present at the time of the seizure, the searches occuring subsequent thereto were lawful, as was the for-

mal arrest after them. *See Michigan v. DeFillipo*, 443 U.S. 31, 35, 36, 99 S.Ct. 2627, 2631, 61 L.Ed.2d 343 (1979); *Rawlings v. Kentucky*, 448 U.S. 98, 111, 100 S.Ct. 2556, 2564, 65 L.Ed.2d 633 (1980). Accordingly, we uphold the district court's conclusion that the encounter left undefiled the fourth amendment's prohibition against unreasonable searches and seizures.

### III.

Our decision upholding the district court's fourth amendment analysis would be moot if the district court's conclusion to entertain the government's probable cause argument was erroneous. The government had waived that argument in the view of the magistrate (and the Jaramillos). The answer to whether the trial judge committed error depends on the nature of the district court-magistrate relationship. We start, then, with an examination of that relationship.

The governing statute is 28 U.S.C. § 636. Section 636(b)(1)(B) states that a judge *may* designate a magistrate to conduct evidentiary hearings on motions to suppress evidence in a criminal case. Section 636(b)(1)(C) states that if so designated, the magistrate shall file *proposed* findings of fact and recommendations with the court. It also states:

> [A]ny party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. *A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate.* The judge may also receive further evidence or recommit the matter to the magistrate with instructions.

28 U.S.C. § 636(b)(1)(C) (1989) (emphasis added).

The statute is quite clear. A district court is *required* to make a *de novo* determination of those portions of the report to which objection is made. Further, the dis-

trict court, in its discretion, *may* change any part of the magistrate's report, including its proposed recommendations. The district court's discretion in this regard is not that normally encountered in "abuse of discretion" scenarios, but rather, it is the "widest discretion" possible. H.R.REP. No. 1609, 94TH CONG., 2d Sess. 11, *reprinted in* 1976 U.S.CODE CONG. & ADMIN.NEWS 6162, 6171. It is discretion of a kind to guarantee that "the ultimate adjudicatory power over dispositive motions [like a motion to suppress] ... is exercised by a judge of the court after receiving *assistance* from and the *recommendation* of the magistrate." *Id.* (emphasis added).

The intent of Congress here is to leave the district court in command. The magistrate's role is one of assistance and recommendation, but nothing more. *See United States v. Raddatz*, 447 U.S. 667, 681, 100 S.Ct. 2406, 2415, 65 L.Ed.2d 424 (1980). A magistrate's decision to view an argument as waived is in no sense binding on a district judge. *See id.* at 673, 100 S.Ct. at 2411. The decision to accept or reject such an argument is left completely to the judge's sound discretion.

That discretion was exercised in this case to hear the government's probable cause argument. And the Jaramillos were given every opportunity to meet the government's argument on its merits. We therefore hold that the district court's decision to entertain the argument was not erroneous.

In accordance with the foregoing, the judgment of the district court is AFFIRMED.