**ROCKWELL GRAPHIC SYSTEM, INC., Plaintiff,**

v.

**DEV INDUSTRIES, INC., et al., Defendants.**

**No. 84 C 6746.**

United States District Court, N.D. Illinois, E.D.

Jan. 31, 1990.

**172**

Stephen P. Carponelli, James E. Hussey, Carponelli, Krug & Lerum, Chicago, Ill., for defendants.

William P. Oberhardt, Michael O. Warnecke, Deborah Schavey Ruff, John M. Augustyn, Neuman, Williams, Anderson & Olson, Chicago, Ill., for plaintiff.

## MEMORANDUM OPINION AND ORDER

ANN C. WILLIAMS, District Judge.

The court has reviewed Magistrate Lefkow's very thorough and thoughtful Report and Recommendation in this case. The court has also reviewed *de novo* those matters in the Magistrate's Report to which Rockwell objects. 28 U.S.C. § 636(b)(1)(C). *United States v. Fenet Jaramillo*, 891 F.2d 620, 627–28 (7th Cir.1989). Rockwell's objections are without merit. Rockwell's main objection, broadly stated, is that Magistrate Lefkow improperly resolved factual disputes regarding Rockwell's procedures for maintaining the trade secret status of its piece part drawings. Rockwell's contentions have a superficial appeal, because there are many points in the Magistrate's Report where she seems to weigh the testimony of Rockwell's witnesses against that of DEV's. Such a weighing of evidence would of course be inappropriate on a motion for summary judgment.

However, Magistrate Lefkow did not impermissibly weigh conflicting evidence. What Rockwell fails to acknowledge is that Magistrate Lefkow dealt with two different categories of evidence. That is, Rockwell presented evidence tending to show the kind of security precautions it took in general to protect its trade secrets. DEV presented evidence showing that in practice many of Rockwell's piece part drawings were not subject to these precautions. Much of Rockwell's evidence was thus irrelevant to the issue Magistrate Lefkow had to resolve: whether or not drawings like the approximately 100 drawings at issue were kept as trade secrets. When there is ample evidence of dissemination of piece part drawings, and that evidence is uncontradicted, it is no answer for Rockwell to say, well, but look at all the precautions we usually take. Magistrate Lefkow points to essentially uncontradicted evidence that the Southtown Economist possessed, and shared with many others, many piece part drawings. Merrill Printing Company also had scores of such drawings, as did *Pathfinder Graphic Systems*. It is wishful thinking on Rockwell's part to claim that the evidence regarding Southtown was effectively destroyed on cross-examination. It was not. Magistrate Lefkow was similarly—and properly—unimpressed by Rockwell's transparent attempt to create a chimerical issue of fact by submitting the affidavit of Robert B. Gaal to contradict his deposition testimony. *Miller v. A.H. Robins Company, Inc.*, 766 F.2d 1102, 1104 (7th Cir.1985).

There are no genuine issues of material fact to preclude summary judgment. The court adopts Magistrate Lefkow's Report and Recommendation in its entirety, and grants summary judgment in favor of the defendants.

## REPORT AND RECOMMENDATION

Dec. 7, 1989.

JOAN H. LEFKOW, United States Magistrate:

This matter is pending on the motion of defendants DEV Industries, Inc., Press Ma-

chinery Corporation ("PMC") and Robert J. Fleck for partial summary judgment under Rule 56, Federal Rules of Civil Procedure. Plaintiff, Rockwell Graphic Systems, Inc., in its six-count amended complaint, rests federal jurisdiction on allegations that defendants violated provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68. Rockwell also asserts five Illinois common law counts, including misappropriation of trade secrets at issue here. The RICO claim charges that defendants engaged in a fraudulent scheme to misappropriate Rockwell's trade secrets and confidential information relating to the design, development, and manufacture of printing presses and replacement press parts. The alleged scheme involves the use of Rockwell's secrets in the manufacture, marketing and sale of competing products. Rockwell alleges that defendant Fleck, as well as defendant Pasquale Peloso (who has since settled), are former employees who had positions of trust and confidence which gave them access to trade secrets and confidential information, that they left their employment at Rockwell to work for DEV and/or PMC and thereafter they surreptitiously obtained Rockwell's trade secrets for DEV and PMC to use for commercial gain. Rockwell alleges that defendants used the mails in furtherance of the scheme to defraud. Defendants' motion to dismiss for failure to state a claim under RICO was denied. Memorandum Opinion and Order of February 12, 1987 (McGarr, J.). Defendants now claim that discovery has demonstrated that Rockwell cannot establish its trade secret allegations because the drawings found in the hands of defendants were not secret in the first place.

## SUMMARY JUDGMENT PROCEDURE

Under Rule 56, Fed.R.Civ.P., summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Summary judgment "will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). On summary judgment, a judge's function is not to weigh the evidence to determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Id.* at 249, 106 S.Ct. at 2511. The burden is on the moving party to point out to the district court that there is an absence of evidence to support the non-moving party's case. *Celotex Corporation v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Rule 56 does not require the movant, however, to negate the other party's claim. *Id.* at 323, 106 S.Ct. at 2553. Where the non-moving party will bear the burden of proof at trial, it must respond to the movant's showing by demonstrating a genuine dispute as to a material fact on that issue. The non-moving party cannot rest on bare pleadings but must designate specific facts in depositions, answers to interrogatories, admissions on file, and affidavits which show that there is a genuine issue of fact. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553–54. In assessing whether a genuine issue exists as to any material fact, the court must view the evidence in the light most favorable to the party opposing summary judgment. *Technograph Printed Circuits, Ltd. v. Methode Electronics, Inc*, 356 F.2d 442, 446–47 (7th Cir.1966). To enter summary judgment, the court must, in effect, conclude that based on the evidence plaintiff intends to rely on at trial, no reasonable jury could return a verdict for the plaintiff. *Weit v. Continental Illinois National Bank and Trust Company*, 641 F.2d 457, 461 (7th Cir.1981).[1]

In keeping with this procedure, this report will state the facts in a light favorable to Rockwell. Unless specifically noted, the time period referred to is during 1978–79

---

1. As actions for injunction, trade secret cases are not tried to a jury. The RICO claim, however, is an action for damages which presumably would be tried to a jury. The question of whether Rockwell's drawings were secret is treated herein as a jury question without resolving precisely whether it actually is or is not.

when the defendants acquired the alleged trade secrets. It will then assess whether a genuine issue for trial exists.

## FACTS STATED IN A LIGHT FAVORABLE TO ROCKWELL

Rockwell is engaged in the business of designing, manufacturing, installing and maintaining printing equipment (primarily single and double width printing presses) for use in the commercial printing and publishing industries. In the course of this business, Rockwell has developed over a period of many years more than a million drawings. As would be expected, many kinds of drawings are involved in the design, manufacture, installation and maintenance of printing equipment, and Rockwell does not claim that all of its drawings are trade secrets. For example, Rockwell has provided assembly drawings to the Chicago Tribune to assist the Tribune in dismantling a press after a breakdown. Similarly, the Detroit Free Press, the Tampa Tribune, the Southtown Economist and Merrill Printing Company, which are all purchasers of Rockwell presses, have numerous such drawings in their possession. These drawings do not contain information, however, that would permit their recipients to manufacture press parts and Rockwell does not contend that they are trade secrets. Nevertheless, each of these drawings contains a legend citing,

> This print is the property of MGD Graphic Systems and is loaned in confidence subject to return upon request and with the understanding that no copies shall be made without the written consent of MGD Graphic Systems. All rights to design or invention are reserved.

(MGD is an aspect of Rockwell). Rockwell does not keep an inventory of the location of these drawings, does not attempt to control their duplication and has never sought the return of any of them.

Some of Rockwell's drawings, however, contain dimensions, tolerances, finishes and the like, necessary to enable someone to manufacture specific parts for printing presses. The manufacturing information contained in these drawings is the result of extensive engineering efforts entailing the expenditure of substantial sums of money. Piece part drawings, for example, are drawings of particular parts of a press. These drawings contain all necessary information including dimensions, tolerances, finishes and materials to be used, which would permit someone to manufacture duplicates of Rockwell's parts.

DEV has been in the business of manufacturing spare parts for printing presses since 1978. During 1978–79, DEV acquired approximately 100 piece part drawings from Rockwell through Fleck and Peloso, former employees of Rockwell who became affiliated with DEV. From 1978 through the filing of the amended complaint, DEV used the drawings, knowingly and without Rockwell's knowledge or permission, to duplicate Rockwell parts. Likewise, PMC, a corporation related to DEV, used the drawings in the manufacture of graphic printing equipment.

George Mishos, Rockwell's Director of Engineering Newspaper Products and 20-year Rockwell employee, by affidavit, states that piece part drawings must be given to vendors-manufacturers of replacement parts and of auxiliary equipment (i.e., equipment a customer needs which will operate with a Rockwell press). When that has been necessary during the past 12 years, Rockwell has made an effort to limit the information provided on the drawing to the minimum necessary for the vendor to do its job. All drawings sent to either type of vendor bear a confidentiality stamp in a contrasting color and the Rockwell legend set out above. In addition, the vendor contract contains a confidentiality agreement:

> **INFORMATION:** (a) Drawings, data, design, inventions, computer software and other technical information supplied by Buyer shall remain Buyer's property and shall be held in confidence by Seller. Such information shall not be reproduced, used or disclosed to others by Seller without Buyer's prior written consent, and shall be returned to Buyer upon completion by Seller of its obligations under this order or upon demand. (b) Any information which Seller may disclose to Buyer with respect to the

design, manufacture, sale or use of the articles covered by this order shall be deemed to have been disclosed as part of the consideration for this order, and Seller shall not assert any claim against Buyer by reason of Buyer's use thereof. Rockwell selects only vendors which it believes it can trust with its confidential information. The vendors generally do not return the drawings to Rockwell but keep them for future use.

The Mishos affidavit states that the Customer Engineering Department has only on rare occasions and under very limited circumstances given piece part drawings to a customer. The isolated instances would be drawings for an obsolete press when a part is needed and this is done only with permission of the head of the Engineering Department. As a policy and practice, however, piece part drawings currently in production, Mishos states, are not sent to customers.

Similarly, Robert Gaal, Rockwell's Director of Sales for its Customer Parts Department, in an affidavit states that Rockwell gives assembly and piece part drawings to customers in "rare" situations such as where (a) the press is obsolete and the parts are no longer being manufactured, (b) there is an emergency breakdown and no part can be obtained, and (c) the drawing is needed to determine what part is needed. According to the Gaal affidavit, drawings are given to Rockwell Customer Parts Department employees under a standard procedure in place since 1979. The employee fills out a request form identifying name, date and drawing number. The drawing is then provided to the employee. This occurs hundreds of times a day. Rockwell does not require the drawings to be returned to the documents vault but the employee discards the drawing. Prior to 1979, disposal was in a wastebasket; after 1979, the discarded drawings were shredded.

The affidavit of Martin Sinott, a 41–year Rockwell employee and Service and Installation Manager, characterizes the distribution of piece part drawings to installers and customers as a rare event, occurring only when necessary to meet a specific need and only with his approval. It is his department's policy that the recipient destroy such drawings when finished with them.

The testimony of witnesses, including Rockwell customers and employees, is inconsistent with some of the statements in the affidavit, particularly with respect to the pervasiveness of distribution of drawings and the internal procedures for their protection. The Southtown Economist, a Rockwell customer, has some of these drawings, some of which came from Rockwell and others of which came from other companies that deal with Rockwell. Southtown's employee, Stroud, testified, "We have an organization called Metro Users, which is [owners of Rockwell's Metro] presses all over the country that if you need something, either a part or even a drawing, if they have it—I mean, everybody shares with everybody." Defendants' Exhibit J, p. 86. Stroud testified that over the years, his best estimate was that more than a dozen times he had received Rockwell parts drawings from vendors that manufacture Rockwell parts for the industry. The Southtown Economist made its Rockwell piece part drawings available to DEV and to a local machine shop to make parts.

Merrill Printing Company (currently inactive) was a user of Rockwell printing presses. Merrill had numerous drawings including parts drawings and layout drawings. Doyle Sutherland was an employee of Merrill who used the drawings during his employment. After leaving Merrill, Sutherland called Merrill and asked for information as it related to drawings and information on bearings for plate cylinders on a Rockwell press. Merrill employees provided Sutherland with two or three boxes of Rockwell drawings. Rockwell does not deny that these included information necessary for manufacture of parts.

The Tampa Tribune also has piece part and layout drawings. These drawings contain a great deal of Rockwell information beyond that necessary for the Tampa Tribune to maintain its Rockwell presses.

The Ft. Lauderdale News and Sun Sentinel also has Rockwell parts drawings. Rockwell and its agents know that Gene Bosco, the Ft. Lauderdale paper's production maintenance manager, maintains a log of Rockwell drawings. Bosco has on occasion sent Rockwell drawings to other manufacturers, namely Jensen Corporation, to manufacture guards and mounts.

None of Rockwell's customers have used Rockwell drawings in competition with Rockwell. Pathfinder Graphic Systems, Inc., also manufactures a press that works in line with Rockwell presses. Seventy-five percent of the 750–1,000 major components of the Pathfinder "Publicator" press interface with a Rockwell "Community" press unit. Pathfinder has long been a vendor of replacement parts for Rockwell. During discovery of this case, Rockwell learned that Pathfinder possesses 21 Rockwell parts drawings. On August 5, 1988, Rockwell requested Pathfinder to return the drawings and to refrain from using the information they contained.

Gordon Etchell, president of Pathfinder, also has copies of pages from the Rockwell Engineering Standards Manual, which he had kept at home while he was a Rockwell engineer, and which he retained after ending his employment with Rockwell. The manual is used by engineers to determine Rockwell's method of determining dimensions, tolerances and manufacturing. Etchell stated that while he worked at Rockwell, he would discard unneeded copies of Rockwell drawings in a wastebasket. (The dates pertaining to Etchell are not of record.)

Robert B. Gaal, Director of Sales for the Customer Parts Department and affiant above, testified that he never issued a directive to purchasing agents or the department under his control that they should request the return of piece part drawings from vendors upon completion of their work. He testified that about 100,000 piece part drawings were sent to vendors over an eight-year period and that most of these drawings were never returned to Rockwell. Rockwell has never asked vendors for an inventory of the drawings in their possession, whether the drawings were segregated, or whether the drawings were lost or stolen. Rockwell is not aware whether a vendor who uses a subcontractor would give access to the drawings to the subcontractor.

Rockwell maintains its drawings in a vault in the Document Services Department. Employees who need to use a drawing are required to sign it out. Access to the vault is limited. George Gunderson, who is in charge of the vault, testified at his deposition that his department would occasionally accept oral requests for drawings. Original drawings must be returned, but copies of Rockwell drawings, made in a location adjacent to the vault, were not systematically returned. Document reproduction occurred in an open area near the vault and employees had access to that area. Copies of 100,000–150,000 prints and drawings were reproduced but not returned to the department. Prior to 1979, the file cabinets containing the aperture cards of Rockwell drawings were not locked and request forms for drawings were not required for many years. Thousands of drawings have been placed in the hands of Rockwell's vendors, customers and others. Rockwell's employee Woelfel, who supervises document reproduction, believes it would be an impossible task to monitor the return of each and every drawing. Rockwell's employees customarily throw drawings in the garbage.

Beginning in 1980, there were 200 or more engineers/draftsmen in Rockwell's engineering department. Any of these employees could requisition prints or drawings from the vault. Normally more than 100 requests per day for drawings were made by these employees and as many as 1,000–1,500 could be out of the vault at any time. Editors who took customer orders had access to Rockwell drawings and used them to determine the proper replacement parts for a customer's printing press.

Until 1981, Rockwell employees were not required to wear badges for entry into the Rockwell facility. Rockwell hired security guards who monitored those who entered the building. Prior to 1979, visitors on the

premises were accompanied by Rockwell employees and were not permitted to tour the premises freely. There were no written prohibitions about bringing visitors to the parts department.

William Boston, Vice–President and General Manager of Rockwell, testified that he was not aware of any written policy concerning the protection of trade secrets during the period 1978–79. He stated that all of their drawings were marked confidential and identified as the property of Rockwell and he believed that Rockwell's employees had a clear understanding of the confidentiality of Rockwell's secrets and how to protect them from public dissemination.

As early as January 25, 1979, Edward H. Nielsen, a high-ranking officer at Rockwell, stated in a memorandum to H.G. Classon, a Rockwell vice-president, that there was no company-wide policy with respect to maintaining the secrecy of Rockwell prints and drawings.

None of the drawings in the hands of customers such as newspaper companies which could be used for the manufacture of parts, were the same drawings as those in the hands of DEV and which are the subject of this lawsuit. Nevertheless, the piece part drawings that these entities had are of the same type as those DEV had.

DISCUSSION

The Illinois Supreme Court has defined a trade secret generally as "... a plan or process, tool, mechanism, compound, or informational data utilized by a person in his business operations and known only to him and such limited other persons to whom it may be necessary to confide it." *ILG Industries, Inc. v. Scott,* 49 Ill.2d 88, 92, 273 N.E.2d 393 (1971), *citing Schulenburg v. Signatrol, Inc.,* 33 Ill.2d 379, 385, 212 N.E.2d 865 (1965); *Victor Chemical Works v. Iliff,* 299 Ill. 532, 545–46, 132 N.E. 806 (1921). The court in *ILG* pointed out that an "exact definition of a trade secret, applicable to all situations, is not possible." *ILG,* 49 Ill.2d at 93, 273 N.E.2d 393. "In many cases the question of whether a specific matter is a trade secret is an extremely close one, often not readily predictable

until a court has announced its ruling." *Id.* at 97, 273 N.E.2d 393.

At issue on this motion is the element of secrecy. Defendants do not contend on this motion that any of the remaining elements of a trade secret are lacking. Secrecy, however, has been labelled "[t]he single most important requirement of the trade secret law". M. Jager, *Trade Secrets Law* § 5.05[1] (1985). "Without satisfying this condition precedent, all other requirements of the trade secret law become irrelevant." *Id.* The United States Supreme Court in *Kewanee Oil Company v. Bicron Corporation,* 416 U.S. 470, 475, 94 S.Ct. 1879, 1883, 40 L.Ed.2d 315 (1974), stated, "The subject of a trade secret must be secret and must not be of public knowledge or of general knowledge in the trade or business." The Illinois Supreme Court in *ILG* observed, "What in reality is protected in cases of this nature is not the product or process, but the secrecy of it." *ILG,* 49 Ill.2d at 97, 273 N.E.2d 393, *citing Jones v. Ulrich,* 342 Ill.App. 16, 30–32, 95 N.E.2d 113 (1950). Trade secret principles are inapplicable if the matter learned was not secret at the time it was obtained because it had already been disclosed to the public. *Koehring Company v. E.D. Etnyre and Co.,* 254 F.Supp. 334 (N.D.Ill.1966).

■ Secrecy, however, is relative, not absolute. Disclosure of secret information to a customer or a supplier of a component part, where necessary for business purpose, "does not in all cases destroy the confidential or secret nature thereof." *ILG,* 49 Ill.2d at 94, 273 N.E.2d 393. Secrecy must be maintained within the plaintiff's business as well as without; disclosure to employees must be limited to those to whom it is necessary to confide it. *See Schulenburg,* 33 Ill.2d at 385, 212 N.E.2d 865 (the controlling definition of trade secret includes requirements that the plan or process be known only to its owner "and those of his employees to whom it is necessary to confide it"). The Restatement describes relative secrecy as follows: "A substantial element of secrecy must exist, so that, except by the use of improper means, there would be difficulty in acquiring the

information." Restatement of Torts ch. 36 § 757 at 6.

■ As Jager points out, "Proof of the existence of the requisite 'relative' secrecy turns on the facts in each case." Jager, *supra*, § 5.05[1]. "[S]ecrecy is a vague concept at best, and is colored by other facts and circumstances present in a particular trade secret case. For every decision upholding the existence of a trade secret, there may well be a mirror-image decision holding the opposite." *Id.* None of the cases which the parties have relied on here presents secrecy as the central issue. *But see MBL (USA) Corp. v. Dickman*, 112 Ill.App.3d 229, 67 Ill.Dec. 938, 445 N.E.2d 418, 221 U.S.P.Q. 725 (1983) (plaintiff failed to show security measures designed to protect its trade secrets). *Compare Syntex Ophthalmics, Inc. v. Novicky*, 745 F.2d 1423, 1434 (Fed.Cir.1984) (manufacturing process details were given sufficiently confidential treatment). *ILG* identifies the following factors as pertaining to this element: (1) The extent to which the information is known outside of plaintiff's business; (2) The extent to which the information is known by plaintiff's employees and others involved in this business; and (3) The extent of measures taken by plaintiff to guard the secrecy of the information. *ILG*, 49 Ill.2d at 93, 273 N.E.2d 393, *quoting* Restatement of Torts § 757, Comment b, p. 6. Other than the *ILG* factors, there is little guiding precedent.

■ The first task is to determine whether there is a genuine issue for trial. Although Rockwell takes the position that an issue of fact exists, the only issue it identifies as being genuinely contested is the procedure governing the employees' protection of trade secrets. The affidavits primarily differ from the testimony of the witnesses by asserting that customers have received drawings only on rare occasions and under limited circumstances and only with a manager's approval. This court believes that these affidavits do not create a genuine issue of fact, however, for two reasons. First, to the extent they create controverted facts, they controvert Rockwell's own testimonial witnesses, including Robert Gaal who was deposed and whose testimony is somewhat inconsistent with his affidavit. A party may not create an issue of fact through affidavits that contradict its own witnesses' depositions. *Miller v. A.H. Robins Company, Inc.*, 766 F.2d 1102, 1104 (7th Cir.1985), *citing Perma Research and Development Company v. Singer Company*, 410 F.2d 572, 577–78 (2d Cir.1969). Second, even accepting the truth of the affidavits, the differences posed do not substantially affect the outcome. By and large, Rockwell's argument is not one of fact but of how the law applies to the facts. It is concluded, therefore, that no genuine issue of material fact exists.

The dispositive issue is whether plaintiff can establish that its piece part drawings were secret at the time defendants appropriated them so that, except by improper means, defendants would have had difficulty acquiring the information. Rockwell contends that because none of the drawings that DEV obtained was in the possession of any other entity disclosed in discovery, those particular drawings were secret. Absent some special treatment or uniqueness of those 100 drawings, however, the evidence discloses no basis to assume that they were treated in any manner differently from any other drawing produced at Rockwell. It must be concluded that DEV's possessing them while others did not is merely happenstance and not because these drawings were more secret than drawings in the hands of other entities. The appropriate context, then, is to determine whether Rockwell's treatment of its piece part drawings was sufficiently protective of their secrecy, applying the *ILG*/Restatement criteria set out above, to establish their secrecy under trade secret doctrine of Illinois.

1. *The extent to which the information is known outside of Rockwell's business.*

The evidence is pervasive that customers and vendors have large numbers of Rockwell drawings, despite affidavits describing it as a rare circumstance. Customers

share with each other, vendors share with customers and subcontractors, and Rockwell employees share with both vendors and customers. Other than the allegations against DEV, there is no evidence that any of these entities used drawings in competition with Rockwell. Nevertheless, it is reasonably clear that a person with such a motive inside any of these organizations would have had little difficulty in obtaining Rockwell drawings. Pathfinder, a Rockwell competitor, had significant access to Rockwell drawings. Seventy-five percent of the 750–1,000 major components of a Pathfinder press interface with a Rockwell press. Although it is undisputed that Rockwell knew of the existence of this press and that Pathfinder has been a major vendor of replacement parts for Rockwell presses for some years, it took no action to investigate whether its drawings had been used until this case was in discovery. There is little basis to conclude that Rockwell's piece part drawings were not widely known outside its business.

2. *The extent to which the information is known by Rockwell employees and others involved in the business.*

The evidence is overwhelming that employees within Rockwell had free access to Rockwell drawings, that minimal, if any, restrictions were placed on access to drawings, that copies of drawings were not required to be returned to the Document Services department, that they were discarded at best in a shredder but without any inventory control, that no one knows how many copies of documents were made and in circulation throughout Rockwell as well as outside Rockwell. There is no evidence that employees were under a restrictive covenant not to disclose information contained in the drawings. There is no basis to conclude that Rockwell protected its secrets from its own employees.

3. *The extent of measures taken by Rockwell to guard the secrecy of the information.*

Although access to the document vault was restricted, the proliferation of copies negates any protection that might have been credited to the vault.

Plant security was not greater than would be expected in any facility to protect from intruders. There is no indication that security was directed at protecting company secrets.

The only security measures Rockwell can point to are the legend on each document identifying it as the property of Rockwell not to be copied without consent, the confidentiality agreement with vendors and that it dealt only with vendors whom it could trust. Although these factors weigh in Rockwell's favor, the evidence is overwhelming that the confidentiality requirements were routinely disregarded and that Rockwell took no measures to enforce them. That vendors have not betrayed Rockwell's trust is also a factor in its favor. Rockwell has pointed to no case, however, from any jurisdiction in which measures limited to a confidentiality stamp, a contractual confidentiality agreement and the lack of a breach of trust are sufficient to garner trade secrets protection. In this case, all of Rockwell's drawings were treated in the same manner, whether purportedly secret or not, which further erodes Rockwell's position that its piece part drawings were protected by such a method.

Having considered the relevant factors, the court is left with the firm conviction that Rockwell during the relevant period failed to take reasonable security precautions to protect its piece part drawings from disclosure to potential competitors who could use them to Rockwell's disadvantage. No reasonable jury could draw a contrary inference. Therefore, the court concludes that plaintiff cannot establish that the drawings in defendants' possession were secret and that defendants are entitled to judgment as a matter of law.

RECOMMENDATION

It is recommended that defendants' motion for summary judgment be granted. Judgment should be entered in favor of defendant on Counts I and II. The remaining counts should be dismissed for lack of federal jurisdiction. *See United Mine*

*Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

Written objection to any finding of fact, conclusion of law, or the recommendation for disposition of this matter must be filed with the Honorable Ann C. Williams within ten days after service of this Report and Recommendation. *See* Fed.R.Civ.P. 72(b). Failure to object will waive any such issue on appeal.